# United States Court of Appeals
## For the First Circuit

No. 21-1171

SUVERINO FRITH, et al.,

Plaintiffs, Appellants,

SAVANNAH KINZER and CHRISTOPHER MICHNO,

Plaintiffs,

v.

WHOLE FOODS MARKET, INC.; AMAZON.COM, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Thompson and Lipez, Circuit Judges,
and Torresen,* District Judge.

Shannon E. Liss-Riordan, with whom Anastasia Doherty and Lichten & Liss-Riordan, P.C. were on brief, for appellants.
Michael L. Banks, with whom Anne Marie Estevez, Terry D. Johnson, Julie V. Silva Palmer, Andrew M. Buttaro, and Morgan, Lewis & Bockius LLP were on brief, for appellees.
Emma Quinn-Judge and Zalkind Duncan & Bernstein LLP for Massachusetts Employment Lawyers Association and American Civil Liberties Union of Massachusetts, Inc., amici curiae.

---

* Of the District of Maine, sitting by designation.

Srish Khakurel, Sophia Hall, Oren M. Sellstrom, and Lawyers for Civil Rights for Lawyers for Civil Rights, Boston Society of Vulcans of Massachusetts, Charles Hamilton Houston Institute for Race and Justice, Jewish Alliance for Law and Social Action, Justice at Work, Inc., and Massachusetts Association of Minority Law Enforcement Officers, amici curiae.

────────────────

June 28, 2022

────────────────

LIPEZ, **Circuit Judge**.  Appellants represent a putative
class of Whole Foods and Amazon employees who were sent home
without pay or otherwise disciplined for wearing face masks bearing
the phrase "Black Lives Matter."  They assert that Whole Foods and
Amazon's enforcement of Whole Foods' previously unenforced dress
code policy in this manner constitutes race-based discrimination
and retaliation in violation of Title VII of the Civil Rights Act
of 1964.  The district court dismissed their suit for failure to
state a claim.  Although our reasoning differs somewhat from that
of the district court, we affirm.

**I.**

Appellants were employed by Whole Foods and its parent
company, Amazon, (hereinafter, "Whole Foods") at stores in
Massachusetts, New Hampshire, California, Georgia, Indiana, New
Jersey, Pennsylvania, Virginia, and Washington.  The Whole Foods
dress code policy "prohibits employees from wearing clothing with
visible slogans, messages, logos, or advertising that are not
company-related."  However, prior to the events at issue in this
case, the policy was "generally unenforced."  For example,
employees were not disciplined for wearing apparel with the logos
of local sports teams and the National Rifle Association, LGBTQ+
Pride flags, the anarchist symbol, and the phrase "Lock Him Up"
(ostensibly a reference to President Trump).

- 3 -

With the onset of the coronavirus pandemic in spring 2020, Whole Foods workers began wearing face masks, including face masks with the cartoon character SpongeBob SquarePants, images and names of vegetables, and prints. Around June 2020, "[f]ollowing the death of George Floyd and demonstrations . . . around the country protesting police violence and other discrimination against Blacks . . . many Black Whole Foods employees and their non-Black coworkers began wearing masks with the message Black Lives Matter." They did so "in a show of solidarity" with the Black Lives Matter movement, "to protest racism and police violence against Blacks and to show support for Black employees."[1]

Appellants believed that Whole Foods would support their decision to wear these masks "because Whole Foods has expressed support for inclusivity and equality and because it previously allowed its employees to express support for their LGBTQ+ coworkers through their apparel without discipline." Further, Whole Foods and Amazon have publicly expressed support for the Black community and the Black Lives Matter message. In the wake of the nationwide protests following Floyd's death, Whole Foods posted on its website "Racism has no place here" and "We support the black community and meaningful change in the world." However, when appellants started

---

[1] While the focus of the suit is on mask-wearing, employees also wore other items bearing the Black Lives Matter message, such as pins, sneakers, and t-shirts. For simplicity, we will refer to all apparel as "face masks" or "masks."

to wear Black Lives Matter face masks at work, Whole Foods began to enforce its previously unenforced dress code policy.[2] Appellants were sent home without pay for refusing to remove their masks and were assigned disciplinary points. Disciplinary points affect an employee's eligibility for raises, and the accrual of disciplinary points can result in termination.

In addition "to protest[ing] racism and police violence against Blacks and . . . show[ing] support for Black employees," employees wearing Black Lives Matter face masks have "made clear that wearing the Black Lives Matter masks is a demand for better treatment of Black employees in the work place," meaning at Whole Foods. In this regard, "[a]s part of their protest in wearing the masks," appellants have "asked for the release of racial demographic data of Whole Foods employees and management, to help determine whether Black employees are receiving promotions fairly." And "they have asked for the removal of armed guards from Whole Foods stores in order to ensure Black employees are comfortable in their workplace." Further, after Whole Foods prohibited employees from wearing Black Lives Matter face masks at work, some employees continued wearing them "in order to challenge

_____

[2] One plaintiff was directly employed by Amazon as a "Prime Shopper" working in a Whole Foods store. Appellants allege that Prime Shoppers were not previously expected to follow the Whole Foods dress code policy, but that, after employees began wearing Black Lives Matter apparel, "Amazon changed its policy to require that its Prime Shoppers comply with the Whole Foods dress code."

what they perceive to be racism and discrimination by Whole Foods for not allowing employees to wear [the masks]."

In July 2020, appellants filed a two-count complaint against Whole Foods, alleging racial discrimination and retaliation in violation of Title VII and seeking class certification on behalf of Whole Foods employees subject to the prohibition on wearing Black Lives Matter face masks at work. Appellants subsequently filed an amended complaint ("the complaint"), which added allegations against Amazon. Defendants moved to dismiss the complaint for failure to state a claim, and the district court granted defendants' motion.[3]

---

[3] Before dismissing appellants' suit for failure to state a claim, the district court dismissed the claims of the non-Amazon employees against Amazon because they had "made no allegations regarding Amazon"; dismissed the claims by the one Amazon employee against Whole Foods because she had "made no allegations regarding Whole Foods"; and dismissed the claims of one plaintiff for failure to allege that she had worn any Black Lives Matter apparel at work or had been disciplined for attempting to do so. Frith v. Whole Foods Market, Inc., 517 F. Supp. 3d 60, 68 (D. Mass. 2021). On appeal, appellants do not challenge these decisions by the district court.

For their part, appellees do not challenge the district court's decision to waive the administrative exhaustion requirement for those plaintiffs who had not yet obtained right-to-sue letters from the EEOC. Possession of a right-to-sue letter is "simply 'a precondition to bringing' suit, not a jurisdictional bar, and thus 'can be waived by the parties or the court.'" Martínez-Rivera v. Puerto Rico, 812 F.3d 69, 77-78 (1st Cir. 2016) (quoting Pietras v. Bd. of Fire Comm'rs, 180 F.3d 468, 474 (2d Cir. 1999)). We therefore do not address this issue further.

- 6 -

Regarding the discrimination claims, the district court stated that plaintiffs "have not alleged that [d]efendants would have treated any individual plaintiff differently if that plaintiff were of a different race. To the contrary, their allegations demonstrate that [d]efendants treated all employees wearing [Black Lives Matter] attire equally, regardless of race." Frith v. Whole Foods Market, Inc., 517 F. Supp. 3d 60, 71 (D. Mass. 2021). The district court further stated that plaintiffs "have not alleged facts suggesting that any individual plaintiff associated with any other employee of a different race or that [d]efendants disciplined any individual employee because of a difference in race between that employee and another employee." Id. at 72. Therefore, the district court concluded that "because no plaintiff alleges that he or she was discriminated against on account of his or her race . . ., [p]laintiffs have failed to state a claim for discrimination under Title VII." Id. at 73.

Regarding retaliation, the district court stated that "wearing [Black Lives Matter] attire to protest racism and police violence against Blacks and to show support for Black employees cannot support a Title VII retaliation claim because it is not done to oppose 'any practice made an unlawful employment practice' under Title VII." Id. at 74 (quoting 42 U.S.C. § 2000e-3(a).) Further, the court stated, the complaint "does not provide enough information to support the inference that each individual

plaintiff wore a [Black Lives Matter] mask in 'opposition' to" Whole Foods enforcing its dress code policy "and was then disciplined for doing so." Id. at 75. The district court therefore also dismissed appellants' retaliation claims.[4] Appellants timely appealed.

## II.

We review de novo the district court's dismissal of a suit for failure to state a claim. Harry v. Countrywide Home Loans, Inc., 902 F.3d 16, 18 (1st Cir. 2018). In considering the sufficiency of a complaint, we are guided by certain bedrock principles set forth by the Supreme Court. A complaint must "possess enough heft to show that the pleader is entitled to relief." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 8 (1st Cir. 2011) (emphasis omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). In other words, to survive a motion to dismiss, a complaint's factual allegations must be "enough to raise a right to relief above the speculative level." Id. (quoting Twombly, 550 U.S. at 555). For example, wholly conclusory claims will not suffice where the defendant's alleged conduct is merely "consistent with" unlawful action and is "just as much in line

---

[4] The district court did not dismiss the individual retaliation claim of Savannah Kinzer, who is not party to this appeal. Kinzer was terminated after she informed Whole Foods management that she had filed discrimination and retaliation charges with the EEOC.

with" lawful action.  Id. at 9 (quoting Twombly, 550 U.S. at 554).
In Twombly, for instance, "[f]inding an 'obvious alternative
explanation' for the alleged [anticompetitive] behavior of the
defendants, the [Court] concluded that the 'plaintiffs here have
not nudged their claims across the line from conceivable to
plausible.'"  Id. (quoting Twombly, 550 U.S. at 567, 570).  Simply
put, a complaint "must contain sufficient factual matter to state
a claim to relief that is plausible on its face."  Grajales v.
P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012).

We have explained that assessing plausibility is "a
context-specific task that requires the reviewing court to draw on
its judicial experience and common sense."  Rodríguez-Reyes v.
Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013) (quoting Ashcroft
v. Iqbal, 556 U.S. 662, 679 (2009)).  If the factual allegations
in a complaint, stripped of conclusory legal allegations, raise no
"more than a sheer possibility that a defendant has acted
unlawfully," the complaint should be dismissed.  Id. (quoting
Iqbal, 556 U.S. at 678); see also SEC v. Tambone, 597 F.3d 436,
442 (1st Cir. 2010) (en banc) ("If the factual allegations in the
complaint are too meager, vague, or conclusory to remove the
possibility of relief from the realm of mere conjecture, the
complaint is open to dismissal.").  With these background
principles in mind, we turn to the specific claims on appeal.

III.

Appellants claim that, by enforcing the dress code policy to prohibit Black Lives Matter face masks, Whole Foods engaged in racial discrimination against both the Black and non-Black employees who wore those masks. Applying de novo review, we ultimately reach the same conclusion as the district court that appellants have failed to adequately plead their claim. However, because our reasoning differs somewhat from that of the district court, we provide a more fulsome explanation of our understanding of appellants' discrimination claims in the context of Title VII law.

**A. Background Law**

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment[] because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[5] This prohibition encompasses "disparate treatment" discrimination, "where an employer has 'treated [a] particular person less favorably than others because of' a protected trait." Ricci v. DeStefano, 557 U.S. 557, 577 (2009)

---

[5] For simplicity, we will refer to employers and employees, although Title VII also prohibits prospective employers from failing to hire a person because of that person's protected characteristic. See, e.g., Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th Cir. 1986).

(quoting <u>Watson</u> v. <u>Fort Worth Bank & Tr.</u>, 487 U.S. 977, 985–86
(1988)). A disparate treatment claim is a claim of intentional
discrimination. <u>See</u> <u>Ray</u> v. <u>Ropes & Gray LLP</u>, 799 F.3d 99, 112
(1st Cir. 2015).[6]  The application of a facially neutral policy
may constitute disparate treatment where an employer uses the
facially neutral policy as a pretext to engage in intentional
discrimination. <u>Hayes</u> v. <u>Shelby Mem'l Hosp.</u>, 726 F.2d 1543, 1547
(11th Cir. 1984) (noting the theory of disparate treatment where
"an employer adopts what appears to be a facially neutral policy,
but one which a plaintiff contends is a 'pretext' for forbidden
discrimination"), <u>disapproved on other grounds by</u> <u>Int'l Union,
United Auto., Aerospace & Agr. Implement Workers of Am.</u> v. <u>Johnson
Controls, Inc.</u>, 499 U.S. 187 (1991).

Although to ultimately succeed on the claim, "[a]
disparate-treatment plaintiff must establish 'that the defendant
had a discriminatory intent or motive' for taking a job-related
action," <u>Ricci</u>, 557 U.S. at 577 (quoting <u>Watson</u>, 487 U.S. at 986),
"[w]e have explicitly held that plaintiffs need not plead facts in
the complaint that establish a prima facie case under Title VII,"

---

[6] In contrast, a "disparate impact" claim involves
<u>unintentional</u> discrimination whereby a neutral policy or
employment practice has a disparate impact on members of a
protected class. <u>See</u> <u>Jones</u> v. <u>City of Boston</u>, 752 F.3d 38, 46
(1st Cir. 2014). We do not understand appellants to be making
disparate impact claims, and we do not discuss this type of claim
further.

- 11 -

Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 24 (1st Cir. 2014). Rather, the complaint simply must contain facts that "plausibly allege" that the plaintiff experienced a discriminatory employment action. Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012) (emphasis added).

Central to any analysis of a Title VII discrimination claim is the Supreme Court's 2020 decision in Bostock v. Clayton County, 140 S. Ct. 1731 (2020). In Bostock, the Court considered whether Title VII prohibits employment actions taken at least in part on the basis of a plaintiff's sexual orientation or gender identity. Id. at 1737, 1741. The Court held that such employment actions are "because of such individual's" sex and are thus prohibited by Title VII's plain language. Id. at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)); id. at 1743. As the Court explained, "[i]f the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee -- put differently, if changing the employee's sex would have yielded a different choice by the employer -- a statutory violation has occurred." Id. at 1741.

We take from the Court's analysis in Bostock, which is rooted in Title VII's language, that when assessing a Title VII discrimination claim, the proper focus is on the protected characteristic of the individual plaintiff. In other words, to constitute unlawful racial discrimination under Title VII, an

employment action must have been taken "because of" the race of the individual plaintiff.  See Bostock, 140 S. Ct. at 1739-40.

This focus on the race of the plaintiff may seem obvious when it comes to the typical Title VII discrimination claim, where, for example, a plaintiff claims that she was discriminated against because she is Black.  But courts have also been faced with so-called "associational" discrimination claims, which present more complex questions concerning the purported racial motive of the employer and the race of the affected employee.

Although we have not previously assessed Title VII claims premised on a theory of associational discrimination, other circuits have recognized this type of claim.  See, e.g., Kengerski v. Harper, 6 F.4th 531, 538 (3d Cir. 2021); Hively v. Ivy Tech Cmty. Coll. of Ind., 853 F.3d 339, 349 (7th Cir. 2017) (en banc); Barrett v. Whirlpool Corp., 556 F.3d 502, 512 (6th Cir. 2009); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 588-89 (5th Cir. 1998), vacated in part on other grounds by Williams v. Wal-Mart Stores, Inc., 182 F.3d 333 (5th Cir. 1999) (en banc) (per curiam); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 892 (11th Cir. 1986).  In the typical associational discrimination claim, an employer purportedly disapproves of a social relationship between an employee and a third party on the basis of a protected characteristic and has taken an employment action based on that disapproval.

For example, in <u>Holcomb</u> v. <u>Iona College</u>, the Second Circuit recognized a Title VII associational discrimination claim brought by a white man who alleged he was fired because of his marriage to a Black woman. 521 F.3d 130, 139-40 (2d Cir. 2008). Significantly, the Second Circuit noted that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's <u>own</u> race" in addition to the race of the other person, like the Black spouse, who may not even be a party in the suit. <u>Id.</u> at 139. Thus, although associational claims like the one in <u>Holcomb</u> appear quite different from the typical Title VII discrimination claim, such claims are fundamentally consistent with <u>Bostock</u> and Title VII's plain language prohibiting action "because of such individual[]" plaintiff's race. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Parr</u>, 791 F.2d at 892 ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of <u>his</u> race."); <u>Zarda</u> v. <u>Altitude Express, Inc.</u>, 883 F.3d 100, 124 (2d Cir. 2018) (en banc) (holding that, in the context of associational discrimination, "when an employer fires a gay man based on the belief that men should not be attracted to other men, the employer discriminates based on the employee's own sex"), <u>aff'd sub nom.</u> <u>Bostock</u>, 140 S. Ct. 1731.

We note that the Sixth Circuit has recognized a claim for discrimination under Title VII based on one's "advocacy on behalf of protected class members." Barrett, 556 F.3d at 513.  In Johnson v. University of Cincinnati, where the plaintiff, who happened to be Black, alleged that he was fired due to his "advocacy on behalf of minorities," the Sixth Circuit opined, "the fact that [p]laintiff has not alleged discrimination because of his race is of no moment inasmuch as it was a racial situation in which [p]laintiff became involved."  215 F.3d 561, 575 (6th Cir. 2000); see also Barrett, 556 F.3d at 514.  In other words, unlike an associational claim, the race of the plaintiff is irrelevant for purposes of this "advocacy" theory of discrimination -- all that matters is the race of the persons on whose behalf the advocacy is occurring.  Title VII's language, as discussed in Bostock, forecloses such a theory, which essentially replaces the textual "because of such individual's race" with the atextual "because of such individual's advocacy for protected individuals." That said, it would be a mistake to doubt the continuing viability of associational discrimination claims merely because some courts may have pushed the concept beyond the bounds of Title VII.

**B. Appellants' Discrimination Claims**

Appellants frame their discrimination claims in the complaint as follows:

- 15 -

> The conduct of Whole Foods in selectively enforcing its
> dress code policy to ban employees from wearing Black
> Lives Matter masks and related apparel . . . constitutes
> unlawful discrimination based on race, because the
> policy has both adversely affected Black employees and
> it has singled out for disfavored treatment advocacy and
> expression of support for Black employees, by both Black
> employees and their non-Black coworkers who have
> associated with them and shown support for them through
> wearing, or attempting to wear, the Black Lives Matter
> masks at work.

These claims certainly could have been stated more clearly.

However, considered in the context of the entire complaint and

Title VII law, we understand appellants to allege that Whole Foods,

in enforcing the dress code policy, intentionally (1)

discriminated against Black employees based on their race;[7] (2)

discriminated against employees based on their advocacy for their

---

[7] Appellants do not precisely allege what they believe
motivated Whole Foods' purported racial discrimination against its
Black employees -- that is, whether Whole Foods was motivated by,
for example, a general animus against Black people, or by
disapproval of Black people expressing opinions on issues of
importance to the Black community. As the Supreme Court made clear
in Bostock, however, Title VII prohibits treating employees less
favorably than they would otherwise be treated "because of" their
race, regardless of the precise nature of the racial motivation.
See Bostock, 140 S. Ct. at 1743-44. A plaintiff is not required
to plead, for example, that an employer was motivated by racial
animus, and an employer may violate Title VII even if its reason
for engaging in racial discrimination is less invidious than
antipathy toward a given race. See id. at 1743 (discussing Supreme
Court precedent holding that an employer engaged in Title VII
discrimination based on sex when it required female employees to
make larger pension fund contributions than male employees "on the
ground that women tend to live longer than men, and thus are likely
to receive more from the pension fund over time").

Black coworkers; and (3) discriminated against employees based on their association with their Black coworkers.[8]

Regarding their "advocacy" allegation, appellants appear, in their briefing, to ask us to adopt a broad theory of discrimination, based on the cases from the Sixth Circuit, that treats the race of individual plaintiffs as irrelevant if they were advocating on behalf of Black people in society or their Black coworkers at Whole Foods. As they explain this theory, the relevant race for purposes of the Title VII discrimination analysis is the race of the people on whose behalf the advocacy is happening, and the race of the advocates themselves is irrelevant. Or, as they put it, "the race of [d]efendants' Black employees is 'imputed' to non-Black employees who advocated on behalf of" their Black colleagues. As we have explained, the language of Title VII and its explication in Bostock foreclose this approach.[9]

---

[8] Although we will focus on plaintiffs' advocacy and associational theories as they apply to non-Black employees, the complaint can be read to also bring advocacy and associational claims on behalf of Black employees. There is nothing in the language of Title VII that would categorically foreclose an associational claim based on a Black employee's association with Black coworkers or other Black people.

[9] Throughout their briefing, appellants also generally assert that the race of the plaintiffs -- whether Black or non-Black -- is irrelevant to their discrimination claim. This proposition fails for the same reason as their "advocacy" theory. That is, as Bostock makes clear, discrimination must be "because of such individual's" race to be actionable under Title VII. 140 S. Ct. at 1738 (emphasis added); id. at 1743.

However, we think that plaintiffs' other allegations --
that the company discriminated against Black employees based on
their race and discriminated against non-Black employees based on
their association with their Black coworkers -- are technically
viable.  Just as the language of Title VII and its explication in
Bostock do not foreclose an associational claim rooted in an
employer's disapproval of an interracial spousal relationship,
Title VII does not necessarily foreclose an associational claim
rooted in an employer's disapproval of its non-Black employees'
support of Black coworkers.

Unlike the district court, then, we do not think that
appellants have failed to allege that the race of the individual
plaintiffs was a motivation for the discrimination.  Nor do we
think their discrimination claims fail because they have not
specifically identified the race of each plaintiff or because they
have not identified specific relationships between Black and non-
Black coworkers.  It is clear from the complaint that appellants
all fall into one of two categories, Black employees who are
subject to racial discrimination and non-Black employees who are
subject to racial discrimination. Perhaps most importantly, we do
not think the fact that both Black and non-Black employees were
disciplined for wearing Black Lives Matter masks undercuts the
discrimination claim.  If an employer discriminates both against
Black employees based on their race and against non-Black employees

based on their status as non-Black people associating with Black people, that employer "doubles rather than eliminates Title VII liability." Bostock, 140 S. Ct. at 1742-43 ("[T]he law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII. So . . . an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability . . . .").

In short, appellants have pleaded discrimination claims that are, conceptually, consistent with Title VII. But such claims cannot be wholly conclusory to survive a motion to dismiss. See Tambone, 597 F.3d at 442; Iqbal, 556 U.S. at 678. As we have explained, a complaint's factual allegations must be sufficient to take a claim beyond the realm of pure conjecture, that is, "across the line from conceivable to plausible." Ocasio-Hernández, 640 F.3d at 9 (quoting Twombly, 550 U.S. at 570). And it is here that appellants' claims fail.

Before we explain this failure, however, it is necessary to clarify appellants' repeated reference to Whole Foods' "selective enforcement" of its dress code policy. The term is evocative of the type of "comparator" evidence that is often used to prove a Title VII claim -- that, for example, a Black employee

was treated differently than a similarly situated white employee.[10]
Yet appellants do not allege that, once Whole Foods began enforcing
its previously unenforced dress code policy around June 2020, the
company applied the policy selectively. They have not alleged,
for example, that once Whole Foods began enforcing the policy, the
company disciplined only the wearing of Black Lives Matter apparel
and did not discipline other violations. Appellants do allege
that, at some point after the onset of the pandemic, Whole Foods
did not discipline employees for wearing masks depicting SpongeBob
SquarePants, images and names of vegetables, and prints. However,
the complaint does not allege that these instances of non-
enforcement occurred <u>after</u> Whole Foods began generally enforcing
the policy around June 2020. Moreover, it is not at all clear
that these other masks violated the policy, which prohibits
"slogans, messages, logos, or advertising."

        Appellants' discrimination claims, then, are less about
"selective enforcement" and more about suspicious timing. They
appear to be claiming that Whole Foods used enforcement of its
existing policy as a pretext to racially discriminate against the

_____

        [10] Although comparator evidence may provide powerful support
for a claim of disparate treatment, the existence of a similarly
situated employee is not a required element of a Title VII
discrimination claim. <u>See</u> <u>Kosereis</u> v. <u>Rhode Island</u>, 331 F.3d 207,
214 (1st Cir. 2003) (describing "evidence that the plaintiff was
treated differently than other similarly situated employees" as
"[o]ne method" for showing disparate treatment).

employees wearing the Black Lives Matter face masks. In support
of this reading of Whole Foods' actions, appellants allege that
Whole Foods only began enforcing the dress code policy after its
employees began wearing the face masks. And they allege that
"Black Lives Matter" is a message concerning racial issues and
representing a social movement to improve conditions for Black
Americans. But these facts alone simply do not take appellants'
claims across the plausibility threshold. Rather, these facts,
even considered in the light most favorable to appellants, support
an "obvious alternative explanation," Ocasio-Hernández, 640 F.3d
at 9 (quoting Twombly, 550 U.S. at 567) -- that Whole Foods was
targeting the display by employees of the "Black Lives Matter"
message for non-race-based reasons rather than targeting the
employees "because of" their race, see Bostock, 140 S. Ct. at 1738
(quoting 42 U.S.C. § 2000e-2(a)(1)).

Specifically, a reasonable inference can be drawn from
appellants' factual allegations that Whole Foods started enforcing
its previously unenforced dress code policy so that it could
prohibit employees from wearing Black Lives Matter masks in its
stores. See Saccoccia v. United States, 955 F.3d 171, 172 (1st
Cir. 2020) (court must "draw[] all reasonable inferences" in
appellants' favor). Common sense, however, suggests that Whole
Foods would have had non-race-based reasons in June 2020 for
prohibiting the wearing of Black Lives Matter masks. See Iqbal,

- 21 -

556 U.S. at 679 (assessing plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").  At that time, the coronavirus pandemic had created the conditions for employees to easily and in a highly visible fashion display non-company messages at work.  It is logical that Whole Foods would have a different perspective on enforcing its dress code policy in the era of employee mask-wearing.  To this point, as appellants appear to acknowledge with their references to engaging in a "protest," the wearing of the Black Lives Matter masks appears to have been a more coordinated and widespread effort than previous displays by Whole Foods employees of, for example, support for the LGBTQ+ community. Moreover, rightly or wrongly, Black Lives Matter was seen as a controversial message associated with a political movement advancing an array of policy proposals.  Thus, the timing of Whole Foods' decision to begin enforcing its existing policy may be explained by the "obvious alternative explanation" that Whole Foods did not want to allow the mass expression of a controversial message by employees in their stores.[11]

Appellants essentially ask us to infer that Whole Foods' motive for targeting the display of the Black Lives Matter message

---

[11] As noted, appellants pleaded that Whole Foods posted on its website, "Racism has no place here" and "We support the black community and meaningful change in the world."  These allegations are consistent with the obvious alternative explanation that, in

by employees was to target the individuals espousing the message -- and that this targeting was "because of" the race of these individuals.  But they have not pleaded any factual allegations pointing in that direction and away from the "obvious alternative explanation" we have identified.  See Air Sunshine, Inc. v. Carl, 663 F.3d 27, 37 (1st Cir. 2011) ("As between [these] 'obvious alternative explanation[s]'" for the purportedly unlawful conduct and the "purposeful, invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion.") (quoting Iqbal, 556 U.S. at 682)).  We cannot infer racial discrimination based on factual allegations that are "just as much in line with" the non-discriminatory explanation we have identified.  Ocasio-Hernández, 640 F.3d at 9 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 554); see also Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 52 (1st Cir. 2020) (noting "the proposition that the plausibility standard is not satisfied when allegations of misconduct are equally consistent with some innocent explanation").

The "obvious alternative explanation" we have identified -- that Whole Foods wanted to prohibit the mass display of a controversial message in its stores by its employees -- could

---

prohibiting the employee masks, Whole Foods was not expressing dislike of the pro-Black aspect of the "Black Lives Matter" message but was simply motivated to control the manner of dissemination of such a message in its stores.

perhaps raise free speech concerns.[12]  But, of course, because
Whole Foods is a private employer, there is no First Amendment
claim here.  We can imagine a viable claim that an employer has
prohibited workplace speech as a pretext for discriminating
against individual employees because of their race.  Nothing in
this decision should be read to foreclose such a claim.  But, in
this case, appellants' allegations simply do not support a
plausible inference that Whole Foods' prohibition on employees'
displaying the Black Lives Matter message in their stores was a
pretext for racially discriminating against the individual
employees.  For this reason, the district court did not err in
dismissing appellants' Title VII discrimination claims.

**IV.**

Appellants also assert retaliation claims under Title
VII, alleging that Whole Foods' "discipline of [its] employees for
opposing [its] discriminatory policy in not allowing employees to
wear Black Lives Matter masks while working at Whole Foods
locations constitutes unlawful retaliation in violation of Title

---

[12] Indeed, the district court and appellees rightly note that
appellants' discrimination claims have the flavor of First
Amendment claims asserting content-based discrimination.  Although
they resist this characterization, appellants themselves heavily
rely on a First Amendment decision, Amalgamated Transit Union Local
85 v. Port Authority of Allegheny County, 513 F. Supp. 3d 593, 597
(W.D. Pa. 2021), which dealt with a prohibition on the wearing of
masks with "political or social-protest messages" by public
transit employees.

VII." They allege that, after Whole Foods began to enforce the dress code, their continued wearing of Black Lives Matter masks became, in part, a protest of what they perceived to be racial discrimination in Whole Foods' decision to enforce the policy. Thus, they contend, when Whole Foods continued to discipline them for wearing the masks, that discipline constituted unlawful retaliation under Title VII.

Before addressing these claims, we briefly set forth the law governing protected conduct under Title VII's retaliation provision. To state a prima facie case of retaliation, appellants must demonstrate "that (1) [they] engaged in protected conduct; (2) [they were] subjected to an adverse employment action; and (3) the adverse employment action is causally linked to the protected conduct." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 94 (1st Cir. 2018). As with racial discrimination claims, appellants need not establish all elements of the prima facie case in their complaint. They must simply allege facts that give rise to a plausible inference that retaliation occurred. Garayalde-Rijos, 747 F.3d at 24.

Protected conduct consists of actions taken in opposition to "any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a); see also Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276-78 (2009) (defining the statutory term "opposed"). Title VII also protects

- 25 -

those who protest employer conduct not proscribed by Title VII if the employee has a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Morales-Cruz, 676 F.3d at 226 (quoting Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009)). However, employees who seek the protection of Title VII's retaliation provision must allege opposition to some aspect of their employment or the conduct of their employer.[13]

As described above, appellants' retaliation theory is premised on their allegation that, at some point after Whole Foods began prohibiting the wearing of Black Lives Matter masks at work, they wore the masks to oppose what they believed to be

---

[13] The requirement that the employees' opposition be directed toward an aspect of their employment dooms a version of appellants' retaliation claims that is only developed in their briefing. In addition to relying on mask-wearing in opposition to enforcement of the dress code, appellants suggest that their initial wearing of the Black Lives Matter face masks was protected conduct under Title VII and, as such, was another appropriate basis for their retaliation claim. However, as described above, the complaint does not identify any unlawful employment practice by Whole Foods that appellants initially were opposing.

Rather, the complaint generally states at various points that employees wore the face masks to "protest[] racism and discrimination in the workplace," and to "demand . . . better treatment of Black employees in the work place." The complaint also states that appellants asked for racial demographic data "to help determine whether Black employees are receiving promotions fairly" and asked that armed guards be removed to ensure that Black employees were comfortable in the workplace. These general allegations do not connect the mask-wearing to any specific policy, practice, or action by Whole Foods that violated, or that appellants could reasonably believe violated, Title VII.

discriminatory enforcement of the dress code.  But appellants must plausibly allege that Whole Foods' continuing enforcement of its dress code policy was caused by their oppositional conduct -- i.e., that any retaliatory discipline was distinguishable from the pre-existing and ongoing discipline of employees simply for wearing the Black Lives Matter masks.  The need to demonstrate that distinct treatment is simply a function of logic: "to establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity."  Trainor v. HEI Hosp., LLC, 699 F.3d 19, 27 (1st Cir. 2012); see also Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d 49, 56 (1st Cir. 2012) ("Absent special circumstances . . . an adverse employment decision that predates a protected activity cannot be caused by that activity.").

Moreover, as the Supreme Court has recognized, employers are not required to "suspend previously planned [conduct] upon discovering that" employees have engaged in oppositional, protected conduct.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).  Thus, because employees cannot prove retaliation by pointing to a course of action by an employer that predates the employees' oppositional conduct, appellants must set forth plausible allegations differentiating Whole Foods' discipline of

the protesting employees from its earlier discipline of employees for violating the dress code.

Appellants' complaint lacks any such allegations. Appellants allege no more than that Whole Foods began enforcing the dress code to prohibit Black Lives Matter face masks in June 2020 and, from that point on, consistently enforced its dress code policy against the mask-wearing.[14] Appellants thus fail to allege the necessary causal relationship between Whole Foods' continuing enforcement of the dress code policy and their wearing of the masks to protest that enforcement.[15]

---

[14] Appellants describe Whole Foods' discipline as "escalating" during the period in which they wore masks to oppose enforcement of the policy, pointing out that employees accumulated disciplinary points for repeatedly wearing the face masks and that "employees are subject to termination once they accumulate a certain amount of points." But continuing discipline of an employee for repeated violations of the dress code is not evidence that Whole Foods had a retaliatory motive. Appellants have not alleged, for example, that any employee who wore a Black Lives Matter mask after the employees began wearing the masks to protest enforcement of the dress code policy received harsher discipline than would be expected for simply violating the policy.

[15] Insofar as appellants also argue that they engaged in protected conduct by protesting societal racism, that contention is not consistent with the case law we have described. Appellants quote Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015), for the proposition that "protected activity includes . . . 'protesting against discrimination by industry or by society in general.'" Planadeball, however, involved a plaintiff who argued she had engaged in protected conduct by lodging specific complaints to her supervisors about derogatory comments, filing a federal complaint, and filing charges of discrimination with the Puerto Rico Department of Labor's Anti-Discrimination Unit. Id. at 175-76. The dicta in Planadeball does not support the broad proposition that protesting societal

**V.**

Ultimately, the outcome of this case says nothing about the importance of the "Black Lives Matter" message, the objectives of the Black Lives Matter movement, the value of appellants' actions in wearing Black Lives Matter masks, or the wisdom of Whole Foods' response to those actions. Rather, the case simply turns on whether appellants have adequately pleaded claims for racial discrimination and retaliation under Title VII. Because appellants have not done so, we affirm the district court's dismissal of their claims.

So ordered.

**-Concurring Opinion Follows-**

issues can, on its own, provide the basis for a Title VII retaliation claim.

TORRESEN, **District Judge, concurring in part and
concurring in the judgment**. While I join the bulk of the opinion,
I part ways with the majority when it comes to Part III.B, the
analysis of appellants' discrimination claim.  As Part III.A of
the opinion explains, the discrimination proscribed by Title VII
is discrimination that occurs because of the race (or other
protected characteristic) of the individual plaintiff(s) bringing
the lawsuit.  In my view, that is where the plaintiffs'
discrimination claim falters.  The amended complaint fails to state
a claim for discrimination under Title VII because it fails to
allege sufficient facts to allow for an inference that Whole Foods
treated the plaintiff employees differently because of their
races.  That is, the amended complaint alleges that all Black and
non-Black employees were subjected to the same discipline for the
exact same reason -- for wearing Black Lives Matter masks, a reason
unrelated to any of the plaintiffs' races.  What the amended
complaint does not allege is that Whole Foods discriminated against
any particular plaintiff based on "such individual's race" (under
either a direct discrimination or associational discrimination
theory).  It is thus unnecessary to rely on the idea that an
"obvious alternative explanation" to race discrimination can be
identified, because, as the district court held, the allegations
are themselves insufficient to state a claim.  "If it is not
necessary to decide more, it is necessary not to decide more."

McIntyre v. RentGrow, Inc., 34 F.4th 87, 101 (1st Cir. 2022)
(Lynch, J., concurring in the judgment) (quoting PDK Lab'ys Inc.
v. U.S. Drug Enf't Admin., 362 F.3d 786, 799 (D.C. Cir. 2004)
(Roberts, J., concurring)).  I would affirm based on the district
court's reasoning that the plaintiffs' allegations demonstrate
that Whole Foods treated all employees wearing Black Lives Matter
masks equally, regardless of their races.