UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| SAVANNAH KINZER, HALEY EVANS, | * | |
| and CHRISTOPHER MICHNO, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-11358-ADB |
| | * | |
| WHOLE FOODS MARKET, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER GRANTING
MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Savannah Kinzer ("Kinzer"), Haley Evans ("Evans"), and Christopher Michno

("Michno," collectively, "Plaintiffs") were employees of Defendant Whole Foods Market, Inc.

("Whole Foods"). They allege they were unlawfully terminated for opposing Whole Foods'

allegedly discriminatory discipline of employees wearing Black Lives Matter masks at work in

violation of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, § 704(a),

42 U.S.C. § 2000e–3(a). Pending before the Court is Whole Foods' motion for summary

judgment, [ECF No. 107], which for the following reasons, is <u>GRANTED</u>.

I.      **BACKGROUND**

        A.      **Factual Background**

        Unless otherwise noted, the following facts are undisputed.[1]

---

[1] The Court draws the facts from Whole Foods' reply to Plaintiffs' responsive statement of
undisputed material facts, [ECF No. 138], and Whole Foods' response to Plaintiffs' statement of
material facts, [ECF No. 139], and the documents referenced therein, which altogether contain

<u>Whole Foods' Standards and Policies</u>

Whole Foods is a chain of grocery stores.  [ECF No. 138 ¶ 1].  It issues General

Information Guides ("GIGs") that contain the minimum standards for all employees within the

Whole Foods organization.  [<u>Id.</u> ¶ 10].  Each store in the United States is assigned to a "Region"

based on its location and each Region has its own GIG with minimum standards and additional

Region-specific policies.  [<u>Id.</u> ¶¶ 2, 10].[2]  The standards all include a policy that prohibits

discrimination on the basis of, among other things, an individual's race.  [<u>Id.</u> ¶ 11].  This policy

encourages employees who believe they have been subject to unlawful discrimination to

"notif[y] any Team Leader, a [Team Member Services] representative, . . . the Senior Vice

President of Team Member Services or an Executive Vice President of Whole Foods Market" or

use Whole Foods' anonymous tip-line.  [<u>Id.</u> ¶ 12].[3]  It also provides that Whole Foods "will not

retaliate against a Team Member for filing a complaint and will not knowingly permit retaliation

by leadership, your co- workers or other Team Members."  [<u>Id.</u> ¶ 13].

During the relevant time period, GIGs also contained progressive discipline, or corrective

action, policies for employees that typically included (1) a verbal warning; (2) a written warning;

and (3) a final written warning culminating in (4) termination.  [ECF No. 138 ¶¶ 15–16, 28].

The specifics of such policies, however, varied across Regions.  [<u>Id.</u> ¶ 20].  For example, the

---

all parties' positions on the material facts.  References to paragraph numbers include both the
statement and response.  Limited parts of those public filings have been redacted, but unredacted
filings have been provided to the Court under seal.

[2] Plaintiffs dispute that these minimum standards "never" varied among Regions, whether in
"policy or practice[.]"  [ECF No. 138 ¶ 10].

[3] Certain employees in Whole Foods' stores are referred to as Team Members and employees
can have supervisory roles like Team Leader or Store Leader.  Whole Foods' Team Member
Services division encompasses its human resources responsibilities.  [ECF No. 139 ¶ 28 n.7].

North Atlantic Region tracked absenteeism and tardiness using a points system. [Id. ¶ 21]. An employee was considered "absent" if they failed to report for an entire shift and "tardy" if they arrived to work more than ten minutes late or left before the end of their scheduled shift. [Id. ¶ 23]. An absence resulted in two points; a tardy resulted in one. [Id. ¶¶ 24–25]. Employees were expected to report tardiness at least two hours prior to the start of a shift, or as soon as possible if the lateness was unexpected. [Id. ¶ 26]. The disciplinary process for attendance violations progressed as follows: (1) a verbal warning, after five attendance points within a 30-day period; (2) a written warning, if another four points were accrued in the next 60 days; (3) a final warning, if another four points were accrued in the 90 days after that; and, finally, (4) termination, if an employee accrued four more points within 90 days after the final warning. [Id. ¶ 28].

Stores in the Mid-Atlantic Region measured absenteeism using a different system that defined "absence" as "any time you are scheduled to work and do not report to work or complete your shift." [ECF No. 138 ¶ 30]. Under this system, an employee would have been subject to corrective action for "excessive absenteeism" if they had (1) 12 full or partial absent days, or more than ten separate absences, in any 12-month period; (2) three separate absences in a 30-day period; or (3) five separate absences in a six-month period. [Id. ¶ 31]. Additionally, if an employee was absent for three consecutive days without notice, they were deemed to have voluntarily resigned. [Id. ¶ 33].

Plaintiffs contend, however, that, in practice, points were not strictly or consistently applied under any of these systems and that employees regularly surpassed point thresholds without receiving the corrective action prescribed by the GIGs. [ECF No. 138 ¶¶ 21, 28].

Plaintiffs assert that Team Leaders were given discretion in assigning points if, for example, a tardiness was due to circumstances outside the employee's control. [Id. 138 ¶¶ 23, 27, 28].

Whole Foods also had a national dress code policy that set a baseline standard for all stores but allowed Regional leadership to modify it with stricter standards. [ECF No. 138 ¶¶ 34–35]. The dress code policy prohibited employees from wearing clothing with "any visible slogan, message, logo or advertising," unless it was branded with Whole Foods' logo or that of other Whole Foods affiliates. [Id. ¶ 37]. Employees who violated the policy could be subject to discipline, [id. ¶ 41], but the no-logo rule was seldom enforced, [ECF No. 139 ¶¶ 35, 39, 71, 95], until the summer of 2020, when Whole Foods started "cracking down" on dress code violations, [id. ¶¶ 67–68].

As of April 13, 2020, Whole Foods required all employees to wear a facemask or face covering while in the workplace due to the COVID-19 pandemic. [ECF No. 138 ¶ 39]. Employees were expected to wear facemasks that complied with the dress code's ban on apparel with any non-Whole Foods slogans, though Plaintiffs dispute whether this rule was immediately enforced in all stores and whether it was made clear to all employees. [Id. ¶ 40]. There is no dispute, however, that what followed that summer was an increased enforcement of the dress code by Whole Foods. The impetus for this change, according to Whole Foods, was an increase in dress code violations by retail workers in its stores between April 2020 and June 2020. [Id. ¶ 43]. As of June 22, 2020, store leadership across Regions was directed to handle violations of the dress code with a consistent, progressive discipline policy that gave employees an opportunity to comply or be sent home, which would result in an attendance violation. [Id. ¶¶ 45, 46]. If the policy violations persisted, stores were instructed to follow their usual progressive discipline process. [Id. ¶ 45; ECF No. 110-6 (Barbara Smith Dep.) at 69:24–73:11; 82:7–83:1].

ii.      Plaintiff Evans

Evans started working for Whole Foods in March or April 2017 in the Marlton, New Jersey store (the "Marlton Store"), which is in the Mid-Atlantic Region.  [ECF No. 138 ¶¶ 4, 47; ECF No. 139 ¶ 41].  Following an unrelated leave of absence, she returned to work on June 16, 2020, and on June 22, 2020 wore, for the first time, a facemask with the words "Black Lives Matter" written across it.  [ECF No. 138 ¶¶ 55–57; ECF No. 139 ¶ 42].  Evans, who is Black, wore the Black Lives Matter mask to support the Black community in the wake of the murder of George Floyd by Minnesota police and to speak out against racism at Whole Foods, which she personally experienced.  [ECF No. 138 ¶ 59; ECF No. 139 ¶¶ 2, 44].  For its part, Whole Foods insists that when employees first started wearing the Black Lives Matter masks, they did it solely to support the greater Black Lives Matter movement in the wake of George Floyd's murder and not in response to any perceived racism in the workplace.  [ECF No. 139 ¶ 2].

Evans asserts that Whole Foods previously failed to address a racist incident against her by a co-worker in February 2019.  [ECF No. 138 ¶ 51].  She was baking in the kitchen and burned rolls, and another retail worker came into the kitchen and said, "Those rolls are darker than you."  [Id.; ECF No. 139 ¶ 45]; see also [ECF No. 110-1 (Evans Dep.) at 29:2–16; 32:3–37:22].  The remark was reported to supervisors at the Marlton Store, who spoke with the employee who made the comment and issued him a final written warning for his behavior.  [ECF No. 139 ¶¶ 52–54].  Evans and other coworkers had also heard another employee, Dante, make numerous racist remarks, including using explicit racial slurs.  [ECF No. 130-2 (Evans Dep.) at 38:18–48:25; ECF No. 110-1 (Evans Dep.) at 44:5–23; ECF No. 140-1 (Evans Dep.) at 45:1–24].  Evans did not report Dante's conduct to Whole Foods.  [ECF No. 140-1 (Evans Dep.) at 45:22–24].

The first day she wore the Black Lives Matter mask, supervisors at the Marlton Store, including Store Leader Nicholas Polidore ("Polidore"), told her that the mask was not permitted under the dress code policy,[4] [ECF No. 138 ¶ 61; ECF No. 139 ¶ 42], and that she had to remove the mask or leave, [ECF No. 139 ¶ 42].  She refused to remove the mask and was sent home. [ECF No. 138 ¶ 63; ECF No. 139 ¶ 42].  The next day team leaders at the Marlton Store met with the employees and reminded them that facemasks with writings or slogans not related to Whole Foods violated the store's dress code.  [ECF No. 138 ¶ 64].

On the first day she was sent home, Evans was interviewed outside of the Marlton Store and told the reporter that she was being sent home for wearing a Black Lives Matter mask and also recounted her prior racist interaction with a coworker.  [ECF No. 139 ¶ 47].  Later that day, Whole Foods received a media inquiry regarding the interview with Evans.  [Id.].  The following day, the link to the story was circulated to Whole Foods executives with a comment from an internal public relations individual specifically pointing out that Evans had also accused the store of ignoring racist remarks made by its employees.  [Id. ¶ 48].

Evans called out of work on her next scheduled shift on June 24, 2020, but nonetheless went to the Marlton Store to speak with a supervisor.  [ECF No. 139 ¶ 49].  The supervisor reiterated that she could not wear a mask with Black Lives Matter written across it while she was working.  [ECF No. 130-2 (Evans Dep.) 227:1–9; ECF No. 139 ¶ 49].  She also raised concerns about Whole Foods' inaction regarding other racist incidents at the store.  [ECF No. 139 ¶ 49]. That same day, Evans called Dave Gearhart ("Gearhart"), Executive Leader of Team Member

---

[4] The applicable GIG stated that "[i]nappropriate messages, slogans and advertisements on clothing is not allowed. Final discretion lies with your store team leader."  [ECF No. 138 ¶ 48]. The parties dispute whether Evans was made aware, prior to this moment, that this policy would apply to facemasks.  [Id.].

Services, to escalate her concern that the sudden enforcement of the dress code policy was directed at the Black Lives Matter message. [Id. ¶ 50].

Evans wore a Black Lives Matter mask during each of her subsequent scheduled shifts on June 27, June 29, July 1, and July 6, 2020. [ECF No. 139 ¶ 51]. Each day she worked until a manager asked her to change her mask, and when she refused, she was sent home. [Id.]. On July 7, 2020, Evans spoke with Gearhart and Store Team Leader Carol Kingsmore ("Kingsmore"). [ECF No. 138 ¶ 68; ECF No. 139 ¶ 52]. Gearhart asked Evans to reconsider wearing the Black Lives Matter mask and encouraged her to come to work. [ECF No. 138 ¶ 68]. The parties dispute exactly what was said during this call, but there is no doubt that Evans was told that continued violations of store policies would warrant further discipline. [ECF No. 139 ¶ 52]. When Evans came into work the next day for her shift, Kingsmore and Polidore gave her a written warning for violating the attendance policy because she had, pursuant to the Mid-Atlantic GIG's progressive discipline policy, accrued at least three absences within a 30-day period, which included the days she was sent home for refusing to take off the Black Lives Matter mask. [Id. ¶ 53; ECF No. 138 ¶¶ 70–72]. They warned her that future attendance violations would result in a final written warning. [ECF No. 138 ¶ 73]. After that, Evans was sent home twice more in July for wearing a Black Lives Matter mask. [ECF No. 139 ¶ 54].

Evans filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on July 24, 2020.[5] [ECF No. 139 ¶ 55]. The next day, she was given a final warning, [id. ¶ 56], and, on August 1, 2020, she was fired for violating the Marlton Store's attendance policy, [id. ¶ 65; ECF No. 138 ¶¶ 85–86]. Some time on the day of or the day before Evans was fired, senior

---

[5] Whole Foods concedes that the complaint was filed and that it was signed on July 24, 2020, but disputes whether it was actually filed on that day. [ECF No. 139 ¶ 55].

leadership, including Gearhart, Barbara Smith ("Smith") (Vice President of Team Member Services) Christina Minardi ("Minardi") (Executive Vice President for Whole Foods), and Jason Nickerson ("Nickerson") (Whole Foods' Counsel), discussed Evans' termination. [ECF No. 139 ¶¶ 64]; see also [id. ¶ 100]. Evans also joined the instant lawsuit the day before she was terminated but did not notify Whole Foods until after she was terminated, when she handed Kingsmore a copy of the civil complaint. [Id. ¶ 63; ECF No. 138 ¶¶ 88–89].

Evans believes Whole Foods tried to "dress [her termination] up as an attendance violation" when really "[she] was being fired over wearing the [Black Lives Matter] mask." [ECF No. 138 ¶ 90 (first alterations in original)]. She had regularly seen employees wear masks with writing and logos, such as sports team logos, without being disciplined for it, [ECF No. 139 ¶ 67], but also testified that when Whole Foods began strictly enforcing the policy, it did so against "all writing and things like that." [ECF No. 140-1 (Evans Dep.) at 81:5–19; 84:14–20; ECF No. 138 ¶ 65]. Evans also recalled multiple occasions where she and others violated other aspects of the dress code but were not disciplined. [ECF No. 139 ¶¶ 68, 71–72].

iii.    Plaintiff Kinzer

Kinzer started working at Whole Foods in April 2020 in a Cambridge, Massachusetts store (the "River Street Store"), located in Whole Foods' North Atlantic Region. [ECF No. 138 ¶¶ 6, 91]. Kinzer wore a Black Lives Matter facemask to work at the River Street Store for the first time on June 24, 2020. [Id. ¶ 95]. She had heard about two Whole Foods employees in New Hampshire who were sent home for wearing Black Lives Matter messaging at work and decided to wear the mask to support the Black community, including "Black co-workers, Black customers, [their] Black community members in [the] city, [the] state, [the] country, [the] world." [Id. ¶ 96 (alterations in original); ECF No. 139 ¶ 10]. That very day, Store Leader Scott

Duncan ("Duncan") instructed employees that the Black Lives Matter masks violated the dress code policy and all team members who refused to take off the masks were sent home. [ECF No. 139 ¶ 11].

Despite Duncan's instruction, Kinzer and other employees continued to wear the Black Lives Matter masks to work, and Kinzer became the leader of employee protests against what employees perceived to be Whole Foods' discriminatory policy regarding Black Lives Matter attire. [ECF No. 139 ¶¶ 12–13]. These protests garnered nationwide media attention and Whole Foods' global relations team knew of the coverage. [Id. ¶¶ 6, 14–15]. Members of Whole Foods' corporate leadership, including Rick Bonin (Regional President for the North Atlantic Region), Duncan, Smith, and Minardi, were aware that Kinzer was a leader in these protests. [Id. ¶¶ 14–15; ECF No. 138 ¶ 121 (citing emails in which Kinzer was referred to as the "main agitator" of the protests)]. Kinzer also asked Bonin for demographic data regarding Whole Foods' leadership positions. [ECF No. 139 ¶ 16]. As early as July 9, 2020, Duncan and Bonin were aware of rumors that Kinzer was contemplating a lawsuit. [Id. ¶ 17].

Kinzer was sent home from work for refusing to remove her Black Lives Matter mask approximately six more times between June 25 and July 4, 2020 and was given an attendance point each time. [ECF No. 138 ¶¶ 100–02; ECF No. 139 ¶ 18]. On July 8, 2020, she received a verbal warning because she had accumulated at least five attendance points within a 30-day period, and an additional final written warning for a separate violation of the attendance policy

unrelated to her noncompliance with the dress code.  [ECF No. 138 ¶¶ 103–04].[6]  Thereafter, she earned two more attendance points on July 10 and 12 for arriving to work late.  [Id. ¶¶ 110, 112].

Kinzer filed charges with the EEOC and the National Labor Relations Board ("NLRB"), dated July 15, 2020, asserting that Whole Foods' discipline of employees who wore a Black Lives Matter mask to work was unlawfully discriminatory and retaliatory.  [ECF No. 138 ¶¶ 115, 119; ECF No. 139 ¶¶ 19–20, 26].  Though the parties dispute the exact day the charges were filed, it is undisputed that they were filed before July 18, 2020.  [ECF No. 138 ¶ 115].

On July 18, 2020, Kinzer again arrived late to work, thus accruing her fourth attendance point since receiving her final written warning on July 8.[7]  [ECF No. 130-1 (Kinzer Dep.) at 160:24–161:5; ECF No. 138 ¶¶ 110, 113].  Her Team Leader notified her that this was her final point, but that she would ask Duncan to excuse the absence as Kinzer attributed it to a stolen bike tire.  [ECF No. 139 ¶ 23].  During her deposition, the Team Leader could not recall any instance where Duncan excused a disciplinary point based on her recommendation.  [ECF No. 140-7 at 48:15–23].  Kinzer said she told Duncan about the EEOC and NLRB charges that day, and about two hours later, he called her into his office and told her she was fired.  [ECF No. 130-1 (Kinzer Dep.) at 186:20–190:8; ECF No. 138 ¶¶ 113–15; ECF No. 139 ¶¶ 19–20].  Kinzer emailed the charges to Duncan at 4:37 p.m.  [ECF No. 130-1 (Kinzer Dep.) at 100 (emails); id. at 186:16–187:7].  At some point during the day, Kinzer also told Duncan "that she was part of some kind of lawsuit[.]"  [ECF No. 130-5 (Duncan Dep.) at 277:9–278:12; ECF No. 139 ¶ 27].

---

[6] Plaintiffs contend that Kinzer also wore a Black Lives Matter mask to work on July 8 and was sent home for it again.  [ECF No. 139 ¶ 18].  Whole Foods adds, and Plaintiffs do not dispute, that Plaintiff accrued an absence on July 5, unrelated to the facemasks. [ECF No. 138 ¶ 105].

[7] Kinzer was also late to work on July 12.  [ECF No. 138 ¶¶ 110–11].

Duncan stated, however, that he had made the decision to terminate Kinzer based on the accumulation of her attendance points before he spoke with corporate personnel, called her into his office on July 18, or learned of the administrative charges or her involvement in a lawsuit. [ECF No. 130-5 (Duncan Dep.) at 273:9–274:1; 278:2–12; ECF No. 138 ¶ 116]. Prior to notifying Kinzer of her termination, Duncan spoke with individuals in Whole Foods leadership, including Bonin, Nickerson, and Minardi, to confirm his decision to terminate her. [ECF No. 130-5 (Duncan Dep.) at 274:2–22; ECF No. 139 ¶¶ 28–30]. He also recalled during his deposition that "at some point" he informed others at Whole Foods about the charges but could not remember who he spoke to about it or when. [ECF No. 130-5 (Duncan Dep.) at 278:13–24; ECF No. 139 ¶¶ 28–29]. Bonin also recalled discussions on calls about the fact that Kinzer had filed "charges or a lawsuit." [ECF No. 130-6 (Bonin Dep.) at 217:15–218:15].

Kinzer believes Whole Foods retaliated against her for wearing the Black Lives Matter mask and organizing her coworkers to protest the store's actions. [ECF No. 138 ¶ 119]. She maintains that she was treated differently from other employees who, up until the time she and other employees started donning Black Lives Matter attire, violated the dress code and attendance policy, but were not similarly disciplined. [Id. ¶ 122; ECF No. 139 ¶¶ 32–34, 38].

iv.     Plaintiff Michno

Michno started working at the Berkeley, California Whole Foods store (the "Berkeley Store") in October 2017. [ECF No. 138 ¶¶ 8, 124]. Like Evans and Kinzer, Michno started wearing a mask with Black Lives Matter written across it in late June or July of 2020. [Id. ¶ 128; ECF No. 139 ¶ 77]. He wore it on and off for approximately two weeks without being told it

violated the dress code or being instructed to remove it.[8]  [ECF No. 139 ¶ 77].  Michno said he wore the mask to make his coworkers "feel seen and held and safe" "[b]y acknowledging that they matter."  [Id. ¶ 78] (alteration in original).  He was further motivated to wear it after a Black coworker was told to take down a Black Lives Matter poster from his workstation.  [Id.].

Michno testified that the dress code policy had not previously been enforced at the Berkeley Store, that he regularly wore shirts with slogans on them, and that managers wore sports paraphernalia "at least every other day."  [ECF 139 ¶ 95].

On July 22, 2020, Michno received his first corrective action for violating the dress code.  [ECF No. 138 ¶ 131; ECF No. 139 ¶ 80].  The disciplinary action resulted in the creation of a form, on which Michno wrote as his statement:

> BLACK LIVES MATTER and asking team members to remove their '[BLACK LIVES MATTER] slogans' is not inclusive of all identities and skin tones. This is a racist policy & I hold myself accountable to create a safe space in my work environment where we are inclusive and accommodate everyone. [A]ll lives don't matter until BLACK LIVES MATTER & I plan to continue to strive for an ANTIRACIST work environment @ WFM.

 [ECF No. 139 ¶ 80].  This statement was relayed to Whole Foods' legal counsel.  [Id.].

Michno stopped wearing the Black Lives Matter mask to work for fear of being terminated, but began again after coworkers shared with him stories of being "scrutinized" based on race, including being passed over for promotions, and after learning that Black coworkers felt that Whole Foods was targeting them by prohibiting the Black Lives Matter masks.  [ECF No. 139 ¶¶ 81–84].  Michno reported to his Team Leader that he was concerned that fellow

---

[8] In late June 2020, around the time Michno first started wearing the mask, Berkeley Store leadership was instructed to temporarily stop its strict enforcement of the dress code policy with regard to Black Lives Matter facemasks because "Team Members had been responding in an aggressive and vocal manner that left Berkeley Store leadership feeling threatened."  [ECF No. 139 ¶ 77; ECF No. 140-11 at 57:21–60:16].

employees, both of whom are Black, were being unfairly disciplined for policy violations and/or being passed up for promotions. [Id. ¶ 83; ECF No. 140-2 (Michno Dep.) 42:8–44:13]. Michno also reported to his manager racist comments made by his Store Leader, Kelly Fox ("Fox"). [ECF 139 ¶¶ 85–86].

Michno wore the Black Lives Matter mask to work again on several occasions in early September 2020 and received a series of corrective actions. [ECF 139 ¶¶ 88, 90]. Around the time that he received his second corrective action on September 7, he told Fox that he was retaining counsel to participate in a lawsuit against Whole Foods. [Id. ¶¶ 88–89]. She replied that she would inform Whole Foods' legal counsel. [Id. ¶ 89]. On September 9, Fox issued Michno a final corrective warning for his violations of the Dress Code Policy, on which Michno wrote: "I will continue to wear Black Lives Matter and use my privilege to advocate for my fellow BLACK coworkers who are systematically oppressed and face discrimination in our own workplace for expressing that their lives matter." [Id. ¶ 90; ECF No. 138 ¶¶ 138–39]. Whole Foods opened an investigation into Michno's allegations of discrimination in the workplace, which Plaintiffs suggest was inadequate. [ECF No. 138 ¶ 140; ECF No. 139 ¶ 92]. Michno also spoke with Fox and a member of Team Member Services to discuss the statement and he repeated his concerns that the prohibition of Black Lives Matter masks was racially discriminatory and that coworkers of color were passed over for promotions. [ECF No. 138 ¶¶ 141–42; ECF No. 139 ¶ 91]. He continued to wear the mask, and on September 13, 2020, was notified that his employment was being terminated for repeated dress code violations. [ECF No. 138 ¶¶ 146, 149].

As with Evans and Kinzer, on the day of or prior to his termination, there was a phone call among leadership, including Smith, the Regional President, and representatives from Team

Member Services and legal counsel, about Michno's potential separation. [ECF No. 139 ¶¶ 93, 100].

Both Smith and Minardi testified that they were not typically notified about employee dress code violations and terminations unless there was some escalated issue. [ECF No. 139 ¶¶ 101–03]. Smith, however, did expect to be contacted about any issues involving COVID-19 or any dress code violations that followed the store's increased mask-related enforcement of the dress code policy. [ECF No. 140-6 (Smith Dep.) at 31:8–23, 76:14–77:5; 78:13–24].

Whole Foods maintains that once it began aggressively enforcing its dress code policy, due to the increase in violations by retail workers beginning in April–June 2020, it did so uniformly against all employees, regardless of whether the employees had filed civil or administrative charges, their race, or the messages on their attire. [ECF No. 138 ¶¶ 43, 45, 122–23].

### B. Procedural Background

A group of plaintiffs, including Kinzer, initiated this case on July 20, 2020, when they filed a two-count complaint against Whole Foods for unlawful racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and sought class certification on behalf of Whole Foods employees subject to the prohibition on wearing Black Lives Matter masks at work. [ECF No. 1]. A first amended complaint filed shortly thereafter added allegations against a second defendant, Amazon. [ECF No. 11]. On February 5, 2021, this Court dismissed all claims but for Kinzer's singular count of retaliation against Whole Foods. [ECF No. 63]. In so holding, the Court concluded that Plaintiffs failed to adequately allege they were discriminated against based on their race within the meaning of Title VII because Whole Foods enforced the dress code policy uniformly against all employees. [ECF No. 63 at 11–17].

At Plaintiffs' request, for purposes of appeal, the Court entered judgment in favor of Defendants on all claims except Kinzer's.  See [ECF Nos. 64–66].  On March 1, 2021, Plaintiffs appealed this Court's Order and Judgment on the motion to dismiss.  [ECF No. 67].  On the same day, with the Court's leave, Plaintiffs filed a second amended complaint, adding two more retaliation claims by new Plaintiffs, Evans and Michno.  [ECF No. 68].  Following a period of discovery, Whole Foods moved for summary judgment on January 12, 2022.  [ECF No. 107].  Plaintiffs opposed the motion on February 25, 2022, [ECF No. 127], and Whole Foods replied on March 18, 2022.  [ECF No. 137].

In the meantime, the First Circuit heard Plaintiffs' appeal and affirmed this Court's order on the motion to dismiss on June 28, 2022, albeit with somewhat different reasoning.  Frith v. Whole Foods Mkt., Inc., 38 F.4th 263 (1st Cir. 2022).  Importantly, in its first chance to do so, the First Circuit recognized associational discrimination claims under Title VII.  Id. at 271–72. The First Circuit held that associational discrimination claims—typically where an employer takes an adverse employment action against an employee because the employer disapproves of their relationship with a third party on the basis of a protected characteristic—are "fundamentally consistent with Bostock and Title VII's plain language prohibiting action 'because of such individual[]' plaintiff's race."  Id. at 272 (alteration in original) (citing Bostock v. Clayton County, 140 S. Ct. 1731 (2020)).[9]

---

[9] The First Circuit simultaneously rejected the viability of the Sixth Circuit's broader associational standard for discrimination claims based on one's "advocacy on behalf of protected class members."  Frith, 38 F.4th at 272.  The Court stated that because "the race of the plaintiff is irrelevant for purposes of this 'advocacy' theory of discrimination—all that matters is the race of the persons on whose behalf the advocacy is occurring[,]" such "advocacy" claims are foreclosed by the plain language of Title VII that prohibits discrimination "'because of such individual[]' plaintiff's race."  Id.

The First Circuit though disagreed with this Court's conclusion that Plaintiffs' discrimination allegations were not viable.

> [W]e do not think that appellants have failed to allege that the race of the individual plaintiffs was a motivation for the discrimination. Nor do we think their discrimination claims fail because they have not specifically identified the race of each plaintiff or because they have not identified specific relationships between Black and non-Black coworkers . . . . Perhaps most importantly, we do not think the fact that both Black and non-Black employees were disciplined for wearing Black Lives Matter masks undercuts the discrimination claim.

Frith, 38 F.4th at 274. But ultimately, the appellate panel affirmed dismissal of the discrimination and retaliation counts because the facts supported an "obvious alternative explanation" for Whole Foods' enforcement of the dress code against the wearing of Black Lives Matters masks, and appellants failed to "set forth plausible allegations differentiating Whole Foods' discipline of the protesting employees from its earlier discipline of employees for violating the dress code." Id. at 275, 277–78. The First Circuit explained,

> Common sense . . . suggests that Whole Foods would have had non-race-based reasons in June 2020 for prohibiting the wearing of Black Lives Matter masks. At that time, the coronavirus pandemic had created the conditions for employees to easily and in a highly visible fashion display non-company messages at work. It is logical that Whole Foods would have a different perspective on enforcing its dress code policy in the era of employee mask-wearing. To this point, as appellants appear to acknowledge with their references to engaging in a "protest," the wearing of the Black Lives Matter masks appears to have been a more coordinated and widespread effort than previous displays by Whole Foods employees of, for example, support for the LGBTQ+ community. Moreover, rightly or wrongly, Black Lives Matter was seen as a controversial message associated with a political movement advancing an array of policy proposals. Thus, the timing of Whole Foods' decision to begin enforcing its existing policy may be explained by the "obvious alternative explanation" that Whole Foods did not want to allow the mass expression of a controversial message by employees in their stores.

Id. at 275 (citation omitted).

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that

there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation[,]" Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

## III.     DISCUSSION

Title VII proscribes employers from retaliating against employees for engaging in protected conduct. 42 U.S.C. § 2000e-3(a). Specifically, it makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id.

Recognizing that plaintiffs in Title VII cases like this one can rarely provide direct proof of an employer's unlawful motivations, the First Circuit employs the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973) to determine whether the record can support an inference of the alleged unlawful conduct. See Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018); Cherkaoui v. City of Quincy, 877

F.3d 14, 24, 28 (1st Cir. 2017) (observing that the <u>McDonnell Douglas</u> framework applies to both discrimination and retaliation claims). Under this three-step framework, the plaintiff first bears the burden of proffering evidence sufficient to establish its *prima facie* case. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>Cherkaoui</u>, 877 F.3d at 28. To make out a *prima facie* case for retaliation "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." <u>Noviello v. City of Boston</u>, 398 F.3d 76, 88 (1st Cir. 2005).

If she makes this showing, she "creates a rebuttable presumption" that the defendant engaged in the unlawful conduct, and the defendant may then "rebut this presumption by pointing to evidence of a legitimate, non-discriminatory reason for the challenged conduct." <u>Cherkaoui</u>, 877 F.3d at 28 (quoting <u>Pina v. Children's Place</u>, 740 F.3d 785, 796 (1st Cir. 2014) and <u>Garmon v. Nat'l R.R. Passenger Corp.</u>, 844 F.3d 307, 313 (1st Cir. 2016)).

Finally, "[i]f the defendant is able to make that showing, 'the presumption . . . disappears and the burden of production again shifts to [the plaintiff], who must offer evidence that [the defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action.'" <u>Cherkaoui</u>, 877 F.3d at 28 (citing <u>Garmon</u>, 844 F.3d at 313).

Whole Foods argues that it is entitled to summary judgment because Plaintiffs have not adduced sufficient evidence to establish either their *prima facie* case, specifically with regard to protected conduct and causation, or that Whole Foods' proffered reason for taking the challenged action is pretextual and not motivated by discriminatory animus. [ECF No. 108].[10]

---

[10] Whole Foods also argues that summary judgment is warranted because Plaintiffs named the wrong corporate entity in their complaint, as they were actually employed by subsidiaries of Whole Foods. [ECF No. 108 at 8, 22–23]. The Court need not address this issue as Plaintiffs' claims fail on other grounds, but nevertheless notes that there could be a sufficient dispute of

At summary judgment, a court may "'bypass the prima facie issue,' and get to the question of whether [Plaintiffs'] evidence of pretext is sufficient." Henderson v. Mass. Bay Transp. Auth., 977 F.3d 20, 30 (1st Cir. 2020) (quoting Luceus v. Rhode Island, 923 F.3d 255, 258 (1st Cir. 2019)) (further citation and internal quotation marks omitted); see also Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (instructing courts at the summary judgment stage to "dispense with strict attention" to the order of the presentation of proof and "focus[] instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.").

The Court will, nonetheless, briefly address the issue of Plaintiffs' statutorily protected conduct, before turning to Plaintiffs' evidence of pretext. It is undisputed that Plaintiffs engaged in protected conduct, at a minimum, by filing administrative charges with the EEOC and NLRB, and by engaging, or threatening to engage in, a Title VII lawsuit. "The statute's participation clause prohibits an employer from discriminating against someone who 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' Title VII[]" regardless of the merits of those charges. Ray v. Ropes & Gray LLP, 799 F.3d 99, 107, 110 (1st Cir. 2015) (citing 42 U.S.C. § 2000e–3(a)).[11]

The Court further finds that Plaintiffs engaged in additional activities protected by Title VII. In addition to filing charges, Title VII protects a broader category of "oppositional

---

facts about Whole Foods' employment relationship with Plaintiffs to prelude summary judgment on this point. See Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 43 (1st Cir. 2007); DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 4–5 (1st Cir. 2011). Perhaps more importantly, the Court would be reluctant to order final judgment at this juncture based on what would appear to be a simple mistake resolvable by leave to amend.

[11] It is likewise undisputed that termination is an adverse employment action. Ponte v. Steelcase, Inc., 741 F.3d 310, 321 (1st Cir. 2014).

activity," meaning it also prohibits employers from retaliating against a person who "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). The protections of the opposition clause "sweep[]. . . broadly." Ray, 799 F.3d at 108. "Protected opposition activity includes responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer." Id. Even where an employer's conduct does not actually prove to be discriminatory, Title VII still protects an employee that has a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Frith, 38 F.4th at 277 (quoting Morales-Cruz v. Univ. of Puerto Rico, 676 F.3d 220, 226 (1st Cir. 2012)) (further citation omitted); see also Ray, 799 F.3d at 110. Plaintiffs' conduct in protest of the prohibition against wearing Black Lives Matter masks while working (whether it was protesting outside the store, continuing to wear the Black Lives Matter masks even after being told not to, complaining to management, or speaking to press) all falls within the opposition clause's "broad sweep."

Whole Foods nevertheless insists that none of this conduct is protected because Plaintiffs could not have had a "good faith, reasonable belief" that the enforcement of the dress code against the wearing of Black Lives Matter masks was discriminatory as it was enforced against all employees regardless of their race, citing for support the previous holding of this Court at the motion to dismiss stage. [ECF No. 108 at 11–13; ECF No. 137 at 2–3]; Frith v. Whole Foods Mkt., Inc., 517 F. Supp. 3d 60, 75 (D. Mass. 2021), aff'd on other grounds, 38 F.4th 263 (1st Cir. 2022). But the First Circuit has since instructed otherwise when it reviewed this Court's Order on the motion to dismiss, explaining that Plaintiffs' discrimination claims against Whole Foods, had they been substantiated, are viable Title VII claims. Frith, 38 F.4th at 274–75. It follows,

then, that the record supports that Plaintiffs could have had a reasonable belief that the prohibition of the Black Lives Matter masks violated the law, and Whole Foods has not put forth any evidence that calls into question the "good faith" nature of their belief.

Moreover, Michno's written statement on his final warning that his "[Black] coworkers . . . face discrimination in our own workplace," which was promptly submitted to Whole Foods' human resources, is at least protected by the opposition clause, if not the participation clause. See e.g., Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007) ("appellant undoubtedly engaged in a protected activity when he contacted . . . [his organization's] human resources department"); cf. Johnson v. Univ. of Cincinnati, 215 F.3d 561, 580 (6th Cir. 2000) (letter to supervisors opposing defendant's perceived discriminatory hiring conduct as a whole was sufficient to constitute oppositional conduct protected by Title VII). Whole Foods' contention that the statement is too "generic and vague" to rise to the level of protected conduct, [ECF No. 108 at 14], is unavailing, particularly given that Michno had already made other grievances to his supervisor about his non-white coworkers being passed over for promotions and that Whole Foods' human resources arm understood the written allegation enough to subsequently open an investigation.[12]

---

[12] Evans' complaint, however, about her nonsupervisory coworker's racist remark does not support a retaliation claim as it cannot alone establish that she reasonably believed the conduct violated Title VII. See O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) (considering the circumstances, "offhand comments and isolated incidents" typically do not constitute violations of Title VII (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))); cf. Campbell v. Bristol Cmty. Coll., 395 F. Supp. 3d 175, 189–90 (D. Mass. 2019) (plaintiff's belief that use of a racist remark violated Title VII was objectively reasonable where the term was "repeatedly used" by university colleagues including the college's president). Allegations that Evans and other coworkers heard some additional racist remarks from other coworkers are not enough to bolster the claim, as courts have found in Title VII cases that secondhand remarks "are not as impactful on one's environment as are direct statements[.]" Sletten v. LiquidHub, Inc., No. 13-cv-01146, 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014);

As it may, the Court will now turn to the second and third steps of the burden-shifting framework.  See Henderson, 977 F.3d at 3; Fennell, 83 F.3d at 535.  Whole Foods has articulated a legitimate, non-discriminatory business reason for Plaintiffs' terminations: specifically, Plaintiffs' repeated violations of Whole Foods' dress code and attendance policies.  Accordingly, to survive summary judgment, Plaintiffs must present enough evidence to raise a jury question as to discriminatory intent.  The Court finds that they have not.

This showing is "more demanding than the assessment of whether a *prima facie* case has been established[.]"  Maldonado-Gonzalez v. Puerto Rico Police, 110 F. Supp. 3d 345, 355 (D.P.R. 2015) (citing Mariani–Colón, 511 F.3d at 222).  "It is insufficient that Plaintiff 'impugn the veracity' of the employer's proffered reason[s] . . . ; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive."  Cherkaoui, 877 F.3d at 27 (citations omitted) (alterations in original); see also Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 12 (1st Cir. 2003) (explaining that a plaintiff "must do more than cast doubt on the rationale" offered by the defendant).  "[P]retext means something worse than a business error," Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 48 (1st Cir. 2019) (internal quotation marks and citation omitted), so a court's focus must be on whether the employer believed its stated reason to be credible, Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991); see also Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 41 (1st Cir. 2013) ("Mere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext." (internal quotation marks and citation omitted)).  To stave off summary judgment,

---

see also Howard v. Cook Cnty. Sheriff's Off., 989 F.3d 587, 601, 602–03 (7th Cir. 2021) (offensive statements learned of secondhand or directed at others "carry less weight" under Title VII).

Plaintiffs may point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal quotations and citation omitted).

Plaintiffs ask the Court to reject Whole Foods' explanation for its decision to terminate them and to instead infer that Whole Foods' motive for terminating them was to retaliate against them, but the record before the Court does not support a finding of pretext.

As evidence of retaliation, Plaintiffs contend that Whole Foods "deviated from the normal termination procedures" when senior corporate executives "track[ed]" Plaintiffs' corrective actions and reviewed their termination decisions, and that this is "evidence from which a reasonable jury may infer retaliatory intent." [ECF No. 127 at 16–17]. An employer's deviation from standard procedure or policies in taking an adverse employment action against a plaintiff may be relevant to the pretext inquiry, Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 96–97 (1st Cir. 2021), but this alleged deviation is consistent with Whole Foods' explanation for its increased enforcement of the dress code policy. While it may be true that senior executives were not typically tuned into day-to-day employee infractions, in the midst of the pandemic in the summer of 2020, corporate personnel were, understandably, very involved in any issues related to COVID-19, including the promulgation of store mask policies and any discipline involving mask-related policy violations. During her deposition, Smith (Vice President of Team Member Services) testified that that she would get involved in a dress code violation "[i]f it was already an escalated process or related to COVID or something along those lines." [ECF No. 140-6 (Smith Dep.) at 31:16–23]. She described an "escalated situation" as

"where [employees have] gone through the process and a team member won't comply, they're getting to a final written warning or some kind of separation consideration[]" and said that she would expect to be contacted in these situations if it involved "[a]ny kind of protocol related to the pandemic and new and emerging policies." [Id. at 76:6–77:2; 78:19–24]. As the First Circuit already observed, "[i]t is logical that Whole Foods would have a different perspective on enforcing its dress code policy in the era of employee mask-wearing." Frith, 38 F.4th at 275. On top of the novelty of the pandemic, the company was confronted with a coordinated display of dress code violations tied to what it perceived to be a political movement or controversial message—distinct from the typical, discrete employee infractions it had seen in the past. See id. ("[T]he timing of Whole Foods' decision to begin enforcing its existing policy may be explained by the 'obvious alternative explanation' that Whole Foods did not want to allow the mass expression of a controversial message by employees in their stores"). The record, at most, reflects a series of arguably ill-advised business decisions by Whole Foods in light of Plaintiffs' dress code violations and the message they sought to display, but it is not one from which a jury could conclude that Whole Foods' legitimate reasons for firing them were "shams" concocted to punish them for protesting its strict enforcement of the dress code.[13]

Plaintiffs also argue that the evidence establishes that they were treated more harshly than other employees who had similarly violated the dress code and time and attendance policies,

---

[13] As further evidence for retaliatory animus, Plaintiffs point to emails among corporate leadership identifying Plaintiffs, particularly Kinzer, as leaders in protest activity, but the substance of those emails largely reflects nothing more than personnel's oversight of the matter. Bonin's description of Kinzer as an "agitator" in one email is not enough to overcome the substantial evidence of Whole Foods' non-retaliatory motives. "[W]hen faced with employment decisions that lack a clear discriminatory motive, courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions[.]" Rodríguez-Cardi, 936 F.3d at 48–49 (citation omitted).

[ECF No. 127 at 17–19], but, even after substantial discovery, Plaintiffs have not identified any similarly situated employee who violated the dress code policy in a similar manner during this time and was treated differently than Plaintiffs.  The evidence demonstrates only that Whole Foods did not strenuously enforce the dress code policy until mid-2020, and that when it increased enforcement, it did so uniformly.  See [ECF No. 140-1 (Evans Dep.) at 81:5–19; 84:14–20 (testifying that, starting in June 2020, Whole Foods strictly enforced the policy against all manner of dress code violations)]; ECF No. 127 at 19 ("Each Plaintiff testified that their store location had leniently enforced the dress code *in the past* . . . ." (emphasis added)).[14]  Moreover, the general assertion that supervisors could have exercised their discretion to excuse infractions, but did not, does not sufficiently allege or establish a link between the enforcement of a disciplinary policy and Plaintiffs' protests.  See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002).

Finally, Plaintiffs aver that the close temporal proximity between their protected activity and termination gives rise to triable issues of fact about pretext, as well as causation.  See [ECF No. 127 at 19–20].  But "while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough—especially if the surrounding circumstances undermine any claim of causation."  Cherkaoui, 877 F.3d at 27 (quoting Carrero–Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 720 (1st Cir. 2014)).  Indeed, the First Circuit has warned that "a 'narrow focus [on timing may] ignore[ ] the larger sequence of events and also the larger truth.'"  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100–01 (1st Cir. 2007) (alterations in original) (quoting Soileau v. Guilford of Me. Inc., 105 F.3d 12, 16 (1st Cir.

---

[14] Plaintiffs analogize favorably to Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144 (1st Cir. 2013), but the Court does not agree.  In Travers, plaintiff's coworker engaged in the same conduct violation, but, unlike plaintiff, was not terminated.  Id. at 148–49.

1997)).  Moreover, Title VII retaliation claims must be proved by "but-for causation," <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 360 (2013), meaning that "[a] plaintiff's retaliation claim . . . fails unless the plaintiff can show 'that the desire to retaliate was the but-for cause of the challenged employment action[,]'" rather than just a motivating factor, <u>Marcinuk v. Lew</u>, No. 13-cv-12722, 2016 WL 111409, at *2 (D. Mass. Jan. 11, 2016), <u>aff'd</u>, No. 16-cv-01182, 2017 WL 3595503 (1st Cir. Feb. 2, 2017) (citing <u>Nassar</u>, 570 U.S. at 339); <u>see also</u> <u>Theidon v. Harvard Univ.</u>, 948 F.3d 477, 505–06 (1st Cir. 2020).  And though the chronology of events in this matter is not entirely without dispute, this point is further weakened by at least some evidence in the record that indicates that Whole Foods began issuing disciplinary points for Plaintiffs' policy violations before they even began engaging in protected conduct.  <u>See</u> <u>Trainor v. HEI Hosp., LLC</u>, 699 F.3d 19, 27 (1st Cir. 2012) ("[T]o establish that an adverse employment action was caused by an employee's protected activity, the employer's decision to act adversely to the employee must postdate the protected activity.").

When viewed as a whole, there is little evidence in the record to refute Whole Foods' legitimate business explanations for its strict enforcement of its dress code policy against the wearing of Black Lives Matter masks and its termination of Plaintiffs as a result, however unwise they might have been.  Further, there is no significant probative evidence that Whole Foods' stated reasons for its actions concealed any discriminatory animus based on Plaintiffs' oppositional conduct.  Accordingly, a factfinder could not reasonably conclude that Whole Foods would not have disciplined and terminated Plaintiffs if it were not for their protected activities.

## IV.    CONCLUSION

To echo the previous sentiments of this Court and the First Circuit panel who affirmed the Court's earlier judgment, this holding is not about the importance of the Black Lives Matter

message, the value of Plaintiffs' advocacy in wearing the masks, the valor of their speaking out against what they perceived to be discrimination in their workplace, or the quality of Whole Foods' decision-making. It is about whether the record can support three retaliation claims under Title VII. Here, the Court finds that no reasonable jury could conclude by a preponderance of the evidence that Whole Foods' reasons for Plaintiffs' terminations were pretextual and motivated by discriminatory animus.

The motion for summary judgment, [ECF No. 107], is therefore <u>GRANTED</u>.

**SO ORDERED.**

January 23, 2023

<u>/s/ Allison D. Burroughs</u>
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE